In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-12-00497-CR
_____

WILLIAM ELBERT POWELL JR., Appellant

V.

STATE OF TEXAS, Appellee

On Appeal from the 1st District Court
Jasper County, Texas
Trial Cause No. 11059JD

MEMORANDUM OPINION

A jury convicted appellant, William Elbert Powell Jr. of indecency with a child by sexual contact with his two-year-old-daughter, H.P. The jury assessed a punishment of three years of confinement and a fine of $4,000. On appeal, Powell argues the evidence is legally insufficient to support the jury's verdict. We find the evidence was legally sufficient to sustain Powell's conviction and affirm the trial court's judgment.

1

## Legal Sufficiency

To determine if the evidence is legally sufficient to support the verdict, we must view all the evidence in a light most favorable to the jury's verdict to determine whether any rational jury could have found, beyond a reasonable doubt, that Powell was guilty of indecency with a child by sexual contact. *See Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). We give deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We will resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

We measure the legal sufficiency of the evidence by the elements of the offense as defined by the hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the

2

State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*.

A person commits the offense of indecency with a child by contact if he engages in sexual contact with a child or causes a child to engage in sexual contact with him when the child is younger than seventeen years of age. Tex. Penal Code Ann. § 21.11(a)(1) (West 2011). If sexual contact is committed with the intent to arouse or gratify the sexual desire of any person, sexual contact under the statute includes:

> (1) any touching by a person, including touching through clothing, of the anus, breast, or any part of the genitals of a child; or

> (2) any touching of any part of the body of a child, including touching through clothing, with the anus, breast, or any part of the genitals of a person.

Tex. Penal Code Ann. § 21.11(c) (West 2011).

In the indictment, the State alleged that Powell intentionally or knowingly engaged in sexual contact with H.P. by touching the genitals of H.P. with the intent to arouse or gratify his sexual desire. At trial, the evidence showed that in April 2010, Powell, his wife, his son, and his daughter all resided in a mobile home in Jasper County, Texas. The mobile home was located a few feet from another mobile home occupied by Powell's cousins, Jeremy and Rene. The bathroom in

3

Powell's mobile home was not working properly, so Powell's family used the bathroom facilities in his cousin's mobile home.

On April 15, 2010, Powell's wife needed to use Jeremy and Rene's bathroom facilities, so she left their mobile home. According to the statement that Powell's wife gave to Officer Bob Walker, when she returned from next door, she found Powell sitting on the bed with his erect penis sticking out of the fly of his boxer shorts. She also stated that H.P. was lying on the bed beside Powell without a diaper, and that Powell's hand was between H.P.'s legs, touching her vagina. According to this statement, when Powell saw his wife, he quickly stopped what he was doing and put a diaper on H.P. Powell's wife stated that she found loose baby wipes all over the bed and suspected that Powell had used them to clean semen off of H.P. She testified that she was concerned that Powell had done something inappropriate and that he had broken the law. Her statement indicates that she then began to yell loudly at Powell.

At trial, Powell's wife testified that she was angry over what she saw and yelled something along the lines of, "You better not have stuck your dick in her[.]" She testified that she did not call the police the day of the incident because she was scared of her husband. Eventually, she took H.P. to the hospital to be examined by a SANE nurse. She testified that she told the nurse that she caught Powell rubbing

4

his finger on H.P.'s outer vagina.  She also testified that she told a Child Protective Services (CPS) worker that she caught Powell with his hand on H.P.'s vagina.  She testified that she knew Powell had an erection because she saw his penis sticking out of his underwear.

Powell's cousin, Jeremy, also testified.  He testified that when the incident in April occurred, he was standing outside Powell's mobile home, in his garden.  He heard Powell's wife yelling at Powell, and it sounded as if she was angry and excited about something.  He testified that it sounded like she had "walked in on something that she wasn't too happy to see[.]"  He testified,

> She yelled –some of the things I can remember—it was awhile back—
> she said: "You sick fuck," or something very close to that nature. And
> I remember her yelling his name, what are you doing. I can't
> remember all the phrases at the moment, but of that nature.

Jeremy also testified that he gave a statement to police after the incident. According to his statement, he heard Powell's wife yell at Powell, "Did you have your dick in her? You better not have had your dick in her. You sick mother-fucker. You're not supposed to F little girls. You got it all over her."  Jeremy testified that he did not immediately report this incident to the authorities, but he spoke with his wife, Rene, who spoke with Powell's wife about what had occurred. Jeremy recalled that after speaking with Powell's wife, Rene called CPS. Rene also testified that while she did not overhear the exchange between Powell and his wife,

5

she did speak with Powell's wife two days after the incident. After speaking with her, Rene contacted CPS.

Officer Bob Walker testified that CPS first notified his office about the sexual abuse allegations concerning Powell. Walker contacted Powell to speak with him regarding the allegations. When Walker first asked Powell about the allegations, Powell indicated that he was just changing H.P.'s diaper when his wife entered the room. In an attempt to explain his erection, he testified he was anticipating having sex with his wife when she returned from their neighbor's house. Walker also spoke with Powell's wife. Walker testified that she was "real nervous" and "kept her head down the whole time." He said she was "[r]eal soft-spoken." He recalled that he noted in his report that while they were within hearing distance of Powell, his wife appeared afraid. He placed her in his vehicle, and once inside, he asked her why she was keeping her head down, and she told him that she was scared of Powell. After the officer reassured Powell's wife that she would be safe, she began to open up about the events that had occurred. She agreed to go to the sub-courthouse and give a written statement about the incident. Officer Walker testified that he typed the statement Powell's wife gave him based on what she said to him. He testified that she read over what he had typed and had

no changes to the statement. Officer Walker denied ever having threatened Powell's wife.

Eurika Collier, with CPS, testified that she was assigned to investigate the sexual abuse allegations against Powell. She testified that she prepared a written report based on her investigation. As part of her investigation, she spoke with Powell and his wife. She recalled that in speaking with Powell, he told her that "he was a little perverted[.]" He also told her that he had no clothes on while he was changing H.P.'s diaper. Powell explained that when all this occurred "he had the hard-on because he had been waiting on his wife to come back into the room." Powell explained to Collier that the wipes were on the bed because he had changed H.P.'s diaper. She testified that her investigation led her to conclude that H.P. had been sexually abused by Powell.

Rachel Jacquet testified that she is a forensic nurse examiner. She examined H.P. on April 28, 2010, and made a written report detailing the findings of her exam. She testified that H.P. was accompanied by her mother and a CPS worker at the exam. In her report, Jacquet noted that Powell's wife stated that Powell rubbed H.P.'s genitalia, "[i]n the wrong way." The report further stated, "He was rubbing with his finger on her outer vagina. She was laying on the bed. I walked in and caught him. It happened on the 14th or 15th." While Jacquet testified that she did

7

not find injury to the genitalia, she explained that finding did not surprise her as two weeks had passed from the time of the alleged incident until the time of the exam.

Powell argues that the evidence is insufficient because his wife recanted parts of her initial statement regarding what she had observed on April 15, 2010. The CPS worker testified and noted in her report that Powell's wife had attempted to recant her initial statement regarding the incident twice. At trial, Powell's wife tried to deny that Powell had an erection when she saw him with H.P. She also testified that she only saw his hand on top of H.P.'s leg. She agreed with Powell's counsel that what she thought she initially saw might have actually been something else. Powell's wife further testified that she felt intimidated by Officer Walker when she gave her statement to the police. She testified that the officer threatened to take her kids away and she felt like she had no other choice other than to sign the statement. She also testified that CPS threatened to take her children away and threatened to put her in jail if she did not cooperate. Both the officer and the CPS worker denied ever threatening Powell's wife. In further contrast though, Powell's wife testified that she told the truth in the statement that she gave to Officer Walker on April 27, 2010. The statement that Powell's wife gave to Officer Walker was introduced as evidence at trial. As indicated above, her statement described in

8

detail Walker's sexual contact with H.P. She concluded her written statement regarding the incident, "I want help to protect my children from William so that nothing else will happen to them."

When a witness recants prior testimony, the factfinder determines whether to believe the original statement or the recantation and is fully entitled to disbelieve a witness's recantation. *See Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991). We conclude that the jury could have disbelieved Powell's wife when she tried to minimize or recant her earlier statements and instead, believed her description of the events as she described them in her initial statement given to the police. We find the evidence legally sufficient to support the jury's findings and affirm the judgment of the trial court.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on December 5, 2013
Opinion Delivered June 25, 2014
Do not publish

Before McKeithen, C.J., Kreger, and Horton, JJ.

9